1
2
3
4
5                UNITED STATES DISTRICT COURT
6                    DISTRICT OF NEVADA
7                           * * *

8   UNITED STATES OF AMERICA,              Case No. 2:14-cr-00099-APG-PAL
9                             Plaintiff,   REPORT OF FINDINGS AND
10                                         RECOMMENDATION
        v.
11                                         (Mtn to Dismiss – Dkt. #36)
    DEONDRE WILLIAMS, et al.,
12
                            Defendants.
13

14          This matter is before the court on Defendant Deondre Williams' Motion to Dismiss

15   Based on Outrageous Government Conduct and/or Pursuant to the Court's Supervisory Powers

16   (Dkt. #36) filed July 28, 2014, which was referred to the undersigned for a report of findings and

17   recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  The court has considered

18   the Motion, the government's consolidated Response (Dkt. #39) filed August 19, 2014, and

19   Williams' Reply (Dkt. #44) filed August 26, 2014.

20                              **BACKGROUND**

21   **I.     Procedural History.**

22          On March 6, 2014, Williams was charged in a criminal Complaint (Dkt. #1) with two co-

23   Defendants, Von White and Michael Knapp, with conspiracy to interfere with commerce by

24   robbery in violation of 18 U.S.C. § 1951(b)(3); conspiracy to possess with the intent to distribute

25   controlled substances (cocaine and methamphetamine) in violation of 21 U.S.C. §§ 841(a) and

26   (b)(1)(B)(ii)(II), (b)(1)(A)(viii), and 846; possession of a firearm in furtherance of a drug

27   trafficking crime and a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i); and felon in

28   possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Williams made an

1    initial appearance on the Complaint on March 6, 2014, was appointed counsel, entered a not

2    guilty plea, and submitted to detention pending trial.  *See* Minutes of Proceedings (Dkt. #3);

3    Order Appointing Counsel (Dkt. #9); Order of Detention (Dkt. #13).

4           On March 18, 2014, a federal grand jury returned an Indictment (Dkt. #16) against

5    Williams and his co-Defendants, charging Williams with conspiracy to interfere with commerce

6    by robbery in violation of 18 U.S.C. § 1951(b)(3); conspiracy to possess with the intent to

7    distribute controlled substances (cocaine and methamphetamine) in violation of 21 U.S.C.

8    §§ 841(a) and (b)(1)(B)(ii)(II), (b)(1)(A)(viii), and 846; possession of a firearm in furtherance of

9    a drug trafficking crime and a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i); and

10   felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Williams

11   was arraigned on the Indictment and entered a not guilty plea to the charges on March 27, 2014.

12   *See* Minutes of Proceedings (Dkt. #21).  Trial is currently scheduled December 1, 2014.  *See*

13   Order to Continue (Dkt. #46).

14          The criminal complaint and Indictment arise out of an ATF undercover investigation of

15   Co Defendant White which resulted in a reverse sting operation that resulted in charges brought

16   against all three Defendants.

17   **II.     The Parties' Positions.**

18          **A.     Williams' Motion to Dismiss (Dkt. #36).**

19          Williams argues the Indictment should be dismissed because the government's conduct in

20   manufacturing the fictional stash house robbery from whole cloth was outrageous, and the

21   Defendants "merely hitched a ride on a moving train" and were misled, deceived, and induced by

22   the government in a "constitutionally-repugnant fashion" to commit the crimes charged in the

23   Indictment.  Williams acknowledges the "extremely high standard" he must meet to show

24   outrageous government conduct, but argues this case is analogous to *United States v. Hudson,* 3

25   F. Supp. 3d 772 (C.D. Cal. 2014), where the indictment in another stash house robbery case was

26   dismissed for outrageous government conduct.  Like the defendant in *Hudson,* Williams asserts

27   that he and his co-Defendants merely "responded to the government's script in this street

28   drama."

When Williams accompanied Knapp and White to the February 25, 2014, meeting with the undercover Bureau of Alcohol, Tobacco and Firearms ("ATF") agent, he had never been charged with or convicted of a stash house robbery.  Williams played no independent role in planning the crime; and like the defendant in *Hudson,* he was along for the ride, anticipating an easy payday.  Rather, ATF agents were directly and continuously involved in planning and directing the criminal activity, and they enticed Williams into participating with the promise of proceeds from the stash house robbery.  For example, the government provided the meeting places and location of the fake stash house, assisted in procuring weapons, and otherwise engineered the fake crime.

Williams asserts that he was not involved in any ongoing criminal activity when he was targeted in the ATF's reverse sting, nor had he ever engaged in, been suspected of, or participated in the planning of a stash house robbery.  His criminal record is also devoid of any prior convictions for drug trafficking.  Williams acknowledges that the Ninth Circuit does not require that the government have individualized suspicion of a defendant's wrongdoing before conducting an undercover investigation but asserts that it is a relevant consideration.  Here, the government had no reason to suspect Williams either before or after conducting a records check on him after the February 25, 2014, meeting.  In addition, without the government's involvement, no crime would have been contemplated or committed by Williams.  Furthermore, the government did not remove any drugs or make the streets of Las Vegas safer in prosecuting these Defendants.

Furthermore, the government pressured, coerced, and pled with the Defendants to commit the crime by appealing to their financial need, and "the loud knock of opportunity was simply too tempting to pass up."  Williams argues ATF Task Force Officer Larios used the rapport he established with co-Defendant White during a series of controlled firearms purchases to induce him into committing fake crimes that he assured White were "easy scores."  He asserts Larios' conduct went beyond encouragement when he said things including making sure the Defendants were "down for it" because it was Larios' "ass on the line;" asking if the Defendants had the tools for the job and telling them he would secure a rental car; describing the robbery as a "good

come up" and saying he needed to find "the right guys" for the job; informing the Defendants he had someone who would pay cash for the drug proceeds; informing the Defendants he wanted to "make sure everything goes cool;" telling the Defendants the proceeds from the robbery would be "split down the middle;" telling them to do whatever they have to; and informing them this robbery was a "tryout," and if it went well he would have more "work down the road," and he would keep the Defendants on "retainer."

Williams asserts that any boasting he did about his past criminal exploits was false and exaggerated and motivated by the promise of a large payout. He asserts that Larios' conduct in ensuring the Defendants brought weapons with them was undertaken simply to enhance the Defendants' culpability and set them up for longer prison sentences. TFO Larios and ATF manufactured this entire sting, and the Defendants could not have committed the crime without the constant direction and support of the government. Williams had no desire, means, wherewithal, or experience to engage in this conduct, and he was manipulated by White and the government to participate.

Alternatively, Williams argues the court should dismiss the Indictment pursuant to its supervisory powers to prevent the government from reaping benefits from its misconduct, even where that misconduct falls short of a due process violation.

**B.     The Government's Response (Dkt. #39).**

The government argues that dismissal for outrageous government conduct may be invoked only when the government's conduct is so grossly shocking and outrageous to violate the universal sense of justice. This is an extremely high standard. In *Black,* the Ninth Circuit recognized that there are only two reported appellate court decisions that have reversed convictions for outrageous government conduct. In *Black*, the Ninth Circuit stressed that each case must be judged on its own particular facts. Applying the *Black* factors, the government argues Williams cannot meet the extremely high standard for dismissal of the Indictment for outrageous government conduct. The government contends the court must apply the *Black* factors to the investigation as a whole and not to each Defendant individually.

/ / /

First, the government had individualized suspicion of co-Defendant White's wrongdoing and had purchased numerous firearms from White, many of which were stolen. The government was also aware of White's criminal history, and White had discussed his prior crimes with the confidential informant ("CI") and undercover agent. The government became aware of Knapp and Williams when White brought them to the February 25, 2014, meeting. After learning their identities, ATF learned of their criminal histories. ATF also learned that Williams was with White when White was shot multiple times on June 21, 2013, by two males who accused White of planning to rob them.

Second, the government concedes that ATF "set the bait" in this case, invented the basic scenario, and decided what amount of drugs was involved. However, all three Defendants responded without further inducement by the government, and White, not the ATF, recruited Williams and Knapp. In addition, all three Defendants boasted about their past criminal exploits. Although the government is entitled to rely on the Defendants' representations of their past criminal conduct in this case, ATF agents also obtained the Defendants' criminal histories which verified their prior violent felony convictions.

Third, the government did not coerce or pressure the Defendants to commit the robbery. Although it proposed the robbery, Defendants "eagerly jumped at the opportunity." Fourth, the entire reverse sting operation consisted of four meetings—one with White alone and three with all three Defendants. Once the scheme was initiated, the government played a minimal role in the crime. It did not provide weapons or difficult-to-obtain materials.

In *Black*, the Ninth Circuit recognized that stash house robberies are largely unreported crimes that propose a great risk of violence in residential communities. The nature of stash house robberies warrants employing this sort of investigation tactic, and the ATF did not randomly recruit people in lower income neighborhoods to commit the fictional robbery. White was already selling guns to the undercover agent, and all three Defendants had convictions for violent felonies and told the government agent "early and often" that they had committed similar crimes. Furthermore, the government did not recruit Knapp and Williams; White did. Finally, all of the undercover meetings were recorded to prove what was actually said and done.

1    With respect to Williams' alternative request that the court dismiss the Indictment under

2    its supervisory powers, the government argues that none of the factors recognized by the Ninth

3    Circuit exist in this case.  A court may only use its supervisory powers to dismiss an indictment

4    (1) to remedy a Constitutional or statutory violation, (2) to protect judicial integrity by ensuring

5    that a conviction rests on appropriate considerations before a jury, or (3) to deter future illegal

6    conduct.  Knapp has not established any evidence of illegal or improper government conduct.

7         **C.    Williams' Reply (Dkt. #44).**

8    Williams replies that the government has not met its burden to show its conduct was not

9    outrageous.  Williams argues that the government's Response illustrates the lack of its

10   individualized suspicion of Williams. Additionally, the government targeted White in an

11   economically-disadvantaged neighborhood heavily populated by African-Americans, and it

12   induced Knapp and Williams—two novices who had little to do with planning the robbery—into

13   participating.  Williams asserts that he and Knapp were only present for two of the nine meetings

14   held with the Defendants and the government, and by the time they began attending those

15   meetings, "much of the nuts and bolts discussion of the robbery had already taken place."  The

16   scheme was created by the government, the CI, and White.

17   Williams asserts that the court should alternatively dismiss the Indictment under its

18   supervisory powers.  First, he argues the government's conduct in this case "teetered perilously

19   close" to violating the Fourth and Fifth Amendment rights of Knapp and Williams—two young

20   African-American men, living in economically-challenging conditions with "non-existent job

21   prospects and an eagerness to prove [their] worth to allegedly higher players."  Second, he

22   asserts that allowing these "runaway prosecutions" to result in convictions undermines judicial

23   integrity because it "irrevocably undermines confidence in the judicial system" and its primary

24   goal of providing equal justice under the law.  Williams asserts that he and Knapp had less to do

25   with the fictional stash house robbery than the investigators who planned it, and to allow them to

26   be convicted would be a manifest injustice.  Finally, Williams argues that the Indictment in this

27   case should be dismissed to deter law enforcement agencies from running amuck, and affirming

28   / / /

1   the reverse sting tactic used here would invite them to simply create more crimes rather than

2   investigate existing ones.

3   **DISCUSSION**

4   The arguments raised in the Motion, Response, and Reply are all derived from facts

5   gleaned from the discovery produced in this case, including audio and video recorded meetings

6   between one or more of the Defendants and undercover officers and/or the CI.  Both sides ask

7   the court to draw different conclusions from the same information but do not fundamentally

8   dispute what occurred in terms of the course of the investigation or the events leading up to

9   Williams' arrest.

10  **I.      Statement of Uncontested Facts**

11  In October 2013, the ATF opened an investigation into co-Defendant Von White, a

12  convicted felon.  An ATF CI told his ATF handler that White had firearms to sell.  White sold

13  the CI eleven firearms in a series of controlled buys on October 24, 2013, November 5, 2013,

14  December 5, 2013, December 13, 2013, January 10, 2014, and January 28, 2014, all of which

15  were surveilled and monitored by ATF agents.  During all of these transactions, the CI was

16  provided with video and audio equipment that recorded the conversations.  These recordings

17  have been transcribed and provided to defense counsel in discovery.

18  On November 5, 2013, the CI conducted a controlled purchase of a stolen handgun from

19  White.  During the sale, White made statements to the effect that he knew young men who were

20  "hungry," who would "kill a . . . for, like, two grand."

21  On December 13, 2013, the CI bought two more handguns from White, one of which was

22  stolen.  The government claims, and Williams does not dispute, that on January 6, 2014, the CI

23  told ATF agents that he had an unrecorded conversation with White on January 2, 2014.  White

24  was with another individual who had multiple felony convictions in Nevada, including robbery,

25  second degree murder, and trafficking a controlled substance.  The CI told ATF that White had

26  acted as a driver and lookout during a recent armed home invasion of a local methamphetamine

27  dealer.  The CI reported to ATF that White claimed the victim of the home invasion robbery

28  revealed where his drug money was located after the robbers threatened to shoot the victim's

1   dog.  The CI reported that White had a large stack of currency and that White said it was his

2   share of the home invasion robbery.  The CI also reported that the second man with White told

3   the CI that he had "rah rahs" available to handle any "business" the CI may have.

4        On January 10, 2014, White sold the CI and undercover ATF Task Force Officer

5   Detective Larios three guns, including a stolen handgun, which ATF investigators later

6   determined belonged to the victim of a 2008 homicide in Phoenix, Arizona.  The ATF did not

7   launch its reverse sting operation until after Larios accompanied the CI to this January 10, 2014,

8   meeting.

9        **A.      January 28, 2014, Meeting.**

10       On January 28, 2014, the CI and Larios made an additional controlled purchase of a

11  handgun and 12 gauge shotgun from White.  During this purchase, Larios told White that he had

12  some "heavy lifting" for White, who responded he was in the "construction business."  Larios

13  told White that he needed the "NFL," not "junior varsity."  White responded that "my dudes are

14  Hall of Fame."  An agreement was made to meet in the near future to discuss the "heavy lifting."

15       **B.      February 12, 2014, Meeting.**

16       On February 12, 2014, White met with the CI and Larios at a Las Vegas restaurant.

17  Larios told White that he worked as a courier, delivering drugs he would pick up from the

18  fictional stash house.  *See* Transcript of February 12, 2014, Meeting at 10, attached as Exhibit 1

19  to the government's Response.  Larios told White the house was guarded by two "Mexican

20  dudes," one of whom was armed with a "strap" [gun] in his waistband.  *Id.* at 10, 13.  Larios said

21  there were up to four kilos of cocaine and eight to ten pounds of methamphetamine, and

22  suggested a home invasion robbery.  Larios asked White to promise him, "if you ain't down to

23  do this shit, bro, no harm no foul.  Fucking forget we ever had this fucking conversation and . . .

24  ."  *Id.*  at 11.  White responded that before they went into more detail, he was "with it all the

25  way" but asked Larios if he wanted the two individuals guarding the stash house "executed or do

26  they live?  I don't give a fuck."  *Id.*  Larios asked White if he was "sure you're down for this

27  shit."  *Id.*  White responded "yeah.  That shit . . . that's . . . what I do."  *Id*. at 13.

28  / / /

1    Larios and White continued to discuss the details of a potential stash house robbery and

2    Larios eventually asked White if he had "done this shit before." *Id*. at 18.  White responded,

3    "you can Google me.  Google my criminal record.  And it show you nothing' but kidnap,

4    robbery.  Robbery, robbery, robbery, robbery, robbery.  That's what I do.  It's how I was raised."

5    *Id.*  Larios specifically asked whether White had done a stash house robbery before, and White

6    responded that he preferred to do them to "stay out of the fed's way" and "'cause what they [the

7    victims] gonna do, call the cops, you know."   *Id*. at 19.   After further conversation, White

8    professed to be a "drug dealing robber."  *Id.* at 20.  Larios told White that if he could not sell the

9    drug proceeds, Larios had "his own people."   *Id*.  Larios said he could not do the robbery with

10   the CI because the "Mexican dudes" had seen the CI with Larios.  *Id*.  White responded he had

11   two people who could help.  *Id*. at 21.  White also said he had "two little brothers" who were in

12   their "prime," who liked to do home invasion robberies, and had "the tools."   *Id*. at 21-29.

13   Larios insisted on meeting them.  *Id*. at 21.

14      White also claimed that he had been shot seven times in front of his apartment by two

15   men.  *Id*. at 31-33.  After the February 12, 2014, meeting, ATF agents investigated and learned

16   that on June 21, 2013, White had been shot multiple times outside of his apartment.  The police

17   report of the incident indicates that the men who shot White believed White was discussing

18   robbing the men.  *See* Police Report, attached as Exhibit 2 to the government's Response.  The

19   police report also indicates that White said a friend was with him during the incident but did not

20   recall if it was Deondre Williams or "Jay Dubb." *Id.* at p 2.

21      **C.     February 25, 2014, Meeting.**

22      Larios set up a meeting with White on February 25, 2014, at the South Point Hotel &

23   Casino.  White brought co-Defendants Williams and Knapp to the meeting.  The transcript of the

24   recorded conversation indicates Larios asked Williams and Knapp if White had told them why

25   Larios wanted to meet with them.  *See* Transcript of February 25, 2014, Meeting at 4, attached as

26   Exhibit 3 to government's Response.  Larios explained that he did deliveries and needed the

27   Defendants to rob a stash house.  *Id*.  Williams responded, "You picked the right people" and

28   stated that the biggest question he had was "the point of entry.  How will we get in?"  *Id*. at 15.

- 9 -

Larios told the Defendants that there would be three to four kilos of cocaine and eight to ten pounds of methamphetamine in the stash house, and the house was guarded by two Mexican dudes, one of whom has a "strap" tucked in the waistband of his pants. *Id*. at 5-6. Williams observed and asked, "There's three of us and two of them, you know what I mean. But which . . . which . . . which one of them is going to be carrying?" *Id.* at 8. White said he had discussed the plan to rob the stash house with Knapp and Williams in the car on the way to the South Point, and they had decided they were "gonna do the zip tie route. Woo, woo, woo . . . zip tie your hands, zip everybody up, a couple stomach shots, maybe give you some body shots." *Id*. at 6-7. When Larios expressed nervousness about the robbery, Williams reassured him that "it's better to be nervous. That means you're on your feet . . . . If you're not then that means you're slipping somewhere. . . . . I'd rather cope with somebody who's nervous because that means you thought about everything. You're thinking everything through." *Id.* at 10. Larios stated he did not think there would be cash at the fictional stash house, but if there were, the proceeds would be "split in half." *Id*. at 12. Despite this, Williams stated, "Man, I thought about this, you know what I mean, so it's like something that I want, but the money, you might want to check that attic." *Id.* at 59.

The Defendants then discussed their plan for robbing the stash house. Their initial plan was that White, Knapp, and Williams would force their way into the home as Larios was leaving. *Id*. at 27-30. Williams, however, suggested that if Larios could not leave the door unlocked as he went in, "then we should probably try to catch [Larios] as [he] coming out." *Id.* at 21. He asked Larios how long he usually spent inside, and when Larios responded five or ten minutes, Williams said while Larios was inside, the Defendants would "need to just rush . . . . we probably might make you back up . . . cause then that's when it's gonna look like real." Williams also observed that "if we go in there while you in there, you let the door unlocked that could . . . look suspicious." *Id.*

Williams also asked Larios to try to get the armed Mexican dude to go with him to the door so that "the person who has the gun" was not in the back room "with time to prepare himself." *Id.* at 26. He also attempted to confirm that only one of the stash house guards was

armed, asking "are you sure that the other guy in the other room . . . like when he goes to the other room (inaudible) pistol in there"  *Id.* at 29.  Larios confirmed that he had never seen the guy in the back room with a gun.  *Id.*  In addition, Williams agreed that the drug proceeds could not be sold in Las Vegas, and that he would go the same route as White to sell the drugs.  *Id.* at 37, 38.

Williams also coached Larios in playing the victim realistically, stating "you want to sell it the best you can.  Back up slowly . . . keep your eyes on us."  *Id.* at 44-45.  He discussed the logistics of getting the drugs and patting down the people in the home, indicating everyone should remain calm and stating "we came here for one thing and one thing only."  *Id.* at 45.  Williams  indicated the robbery should occur quickly, "wham, bam, thank you ma'am," and the Defendants should wear "beanies" over their faces, and they could purchase them at the dollar store.  *Id.* at 60.

ATF conducted a records check after meeting Knapp and Williams and learned that Williams had a 2008 Nevada felony conviction for burglary and felon in possession of a firearm.  Knapp's record showed a 2007 California conviction for participating in a criminal street gang/carrying a concealed firearm, and a 2010 conviction for inflicting corporal injury on a spouse.

**D.   March 2, 2014, Meeting.**

On March 2, 2014, Knapp met with Williams, White, Larios, and undercover ATF Special Agent John Carr at the South Point Casino in Las Vegas, Nevada.  The first part of the meeting occurred on the casino floor, and then everyone went to a hotel room rigged with undercover cameras to talk with Larios' "big homie," Special Agent Carr.  Carr had everyone sit down and stated that he had come from Los Angeles to Las Vegas "to do some work" and wanted "to make sure I feel good about this and number one I want to make sure nothing happens to [Larios]."  *See* Transcript of March 2, 2014, Meeting, attached as Exhibit 4 to government's Response at 9.  Carr also stated that he was concerned about the police, someone talking, and having the robbery "come back on us."  *Id.*  White responded that he had been around since twelve, and had "prison time up under me," but no "dirty jacket."  *Id.*  White also

stated that he was cautious by nature and that was why he had "made it this far." *Id.* at 10.  Carr stated that he was there to "make sure . . . everything goes cool." *Id.*

Carr stated that the proceeds of the robbery would be divided equally, and Knapp responded "everything equal." *Id.*  White discussed what he had "planned out in [his] brain" about how to do the robbery and have his "two brothers" get the drop on the dealer as soon as the dealer came to the door. *Id.* at 11.  Carr offered to get a rental car the Defendants could use, stating he "got this female that works at a rental car company that lets us take cars off the lot with no papers . . . . I can get you guys one just so that you don't got to drive your own fucking ride." *Id.* at 14.  Knapp responded, "That's what I'm talking about.  We need one." *Id.* Williams too indicated that he was concerned about the car, and he "appreciate[d] the fact that Carr mentioned the rental car. *Id.* at 19.  White assured Carr, "This one gonna  . . . gonna go perfect.  Keep me in mind for the future." *Id.* at 15.  Carr responded that if everything "works out clean, then everything is good," he "definitely  . . . got some work down the road." *Id.* at 16.

Williams stated that he had been thinking about the plan for a couple of days and was "kinda low key losing sleep over it." *Id.* at 17.  Williams said that he liked everything to "be right" and was concerned that "the other dude doesn't have something in the room waiting, you know." *Id.*  He asked whether Carr and Larios were sure "nobody else is watching [the stash house]." *Id.* at 32.  White told Carr that Larios "may have to get hit in the stomach." *Id.* at 18.  Carr responded that Larios was "gonna have to play a role." *Id.*  Williams and Knapp both stated that the scheme involved acting, playing a role, with Williams instructing, "You have to sell that shit. . . . . selling it good." *Id.* at 18, 21.   Carr, Larios, and all three Defendants had an extended discussion about making it look realistic so that Larios was not implicated.  For example, Williams stated that the point of entry would be when Larios was getting ready to leave because "it looked more realistic like that." *Id.* at 22.

Carr then asked how the Defendants planned on getting rid of the narcotics they were going to get. *Id.* at 24.  Carr said that the bricks were packaged in a certain way and would need to be "broken down" and repackaged. *Id.* at 24.  Williams admitted "I thought about that too . . . you have to repackage it . . . if you try to sell it." *Id.* at 25.  White, Williams, and Knapp

discussed their plan to sell their part in Texas because in Las Vegas, as Williams stated, "Some people I don't even know because everything will come back to you." *Id.* at 24-25. Carr told the Defendants that the "crystal" was one hundred percent pure and that the cocaine was "top of the line." *Id.* at 25.

Williams asked if Carr would provide the rental car the day before the planned robbery. *Id.* at 26-27. Carr responded that he could not. *Id.* at 27. Williams asked if Carr was "sure it's covered?" Carr responded, "I will have that, guaranteed." Carr asked what type of vehicle the Defendants wanted, and Williams responded "an SUV with some tints." *Id.*

The discussion shifted to the cell phone the Defendants would use for the robbery. Williams told Larios not to save the number in Larios' cell phone, but to write it down in case someone took Larios' phone and tried to look through it. *Id.* at 28. Larios stated "that's smart." *Id.* at 28-29.

Carr told the Defendants he wanted them on time, ready to roll, "tooled up, ready to do your thing." *Id.* at 30. Carr and Larios stressed that it was important to be on time so everything would "look like normal," and if Larios was late, the dealers would "close up." *Id.* at 31. Williams asked Larios and Carr whether they were sure no one would be watching the house. *Id.* at 32. Carr said no one watched the house, explaining that the drug dealers were smart and were connected with a real estate company that told them about vacant houses and different spots for their deals. *Id.* at 32-33.

Carr guaranteed that he would call the Defendants on Wednesday. *Id.* at 36-37. White stated, "So look, man, Tuesday you all gonna be in my crib." *Id.* at 37. Williams asked what time Carr was going to get the rental car. *Id.* Carr said he would get the car and that everyone should meet a little before seven. *Id.* Carr said he felt good about everything. *Id.* at 38. Williams responded, "I'm not all smiley today, you know." *Id.* at 38. Knapp said, "You got our . . . you got our word for everything." White said that he was a "longevity-type person" and was born and raised in Carr's hometown of Los Angeles. The meeting closed with White stating it was nice meeting Carr. *Id.* at 40. In response to Larios' comment "We can do this, man," Knapp said, "Yeah. We're gonna do this. We're good." *Id.* White told Larios, "I'm gonna use me for

you.  So if I give you a cool looking body shot, they gonna . . . they gonna be like damn that hurt." *Id.* at 41.

**E.      March 5, 2014, Meeting and Arrest.**

Larios called White on March 5, 2014.  White, Williams, and Knapp arrived at a gas station in a car driven by a woman to meet Larios.  The female driver followed Larios to a warehouse on East Post Road in Las Vegas where the Defendants were dropped off, and the woman left in the car.  The meeting at the warehouse was recorded.  *See* Transcript of March 5, Meeting, attached as Exhibit 5 to the government's Response.

Carr said his first concern was to ensure nothing happened to Larios.  *Id.* at 2-3.  Williams responded, "Yeah," and White agreed, stating, "That's the first concern."  *Id.* at 3.  White said he had done a lot of talking with Knapp and Williams and had figured out more details of what they were going to do.  *Id.*  The plan was that when Larios said his goodbyes and opened the door, "we coming in."  *Id.*  Williams stated, "We thought about it . . . and we know we always thought actually running in my head about leaving the door unlocked and that might fall back on him."  *Id.* at 4.  White and Williams both said that they wanted the "gunman up close and personal."  *Id.*  Carr responded that that made him feel better, and Knapp asked, "We good?"  *Id.*  Larios then asked what the Defendants would point at him because he did not want to be surprised.  *Id.* at 4-5.

Williams and Knapp said they had zip ties.  Larios stated he just wanted "to make sure you came prepared, dude."  *Id.* at 5.  White said he had a Mossberg, and "they got their little hand tools."  *Id.*  Knapp said he had a hand tool in his pocket.  Williams said, "Mine's going in my pants."  *Id.* at 6.  Carr stated, "Anyone who's got any issues or concerns now is the time to put it out."  *Id.*  Williams responded, "It's show time.  We wouldn't be here."  *Id.*  Knapp responded, "It's show time."  *Id.*  White responded, "I got my ass here."  *Id.*  Williams added, "We're ready."  *Id.*  At this point, the Defendants were arrested.

/ / /

/ / /

/ / /

II.     **Applicable Law & Analysis.**

A.     **Request for Evidentiary Hearing.**

The caption of the Motion to Dismiss requests an evidentiary hearing.  However, the motion itself does not provide an offer of proof or articulate what Williams expects an evidentiary hearing would establish if one was conducted.  The Ninth Circuit has held that an evidentiary hearing is necessary where a defendant alleges facts with "sufficient definiteness, clarity, and specificity" to enable the court to conclude that contested issues of fact exist.  *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (internal citations omitted).  The court need not hold a hearing on a defendant's pretrial motion "merely because a defendant wants one.  Rather, the defendant must demonstrate that a significant disputed factual issue exists such that a hearing is required."  *Id*. (internal citation omitted).  The determination of whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court.  *See United States v. Santora*, 600 F.2d 1317, 1320 (9th Cir.) *amended by* 609 F.2d 433 (9th Cir. 1979).

The government attached the transcripts of the February 25, 2014, and March 2, 2014 meetings, along with several other exhibits to its Response.  Williams has not challenged the accuracy of the transcripts, disputed their authenticity, or otherwise established a contested issue of fact which warrants an evidentiary hearing.  The court will therefore deny Williams' request for an evidentiary hearing.

Williams seeks dismissal of the indictment for outrageous government conduct under the due process clause of the Fifth Amendment, or alternatively, under the court's inherent supervisory powers.

B.     **Outrageous Government Conduct.**

In *United States v. Russell*, 411 U.S. 423, 431-32 (1973), the Supreme Court held that outrageous government conduct occurs when the actions of law enforcement officers or informants are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  A dismissal of an indictment for outrageous government conduct is rooted in the due process clause of the Fifth Amendment of

*/ / /*

1    the Constitution which provides, "no person shall . . . be deprived of life, liberty, or property

2    without due process of law."  U.S. Const. amend. V.

3         The Ninth Circuit has held that dismissal of an indictment for outrageous government

4    conduct is "limited to extreme cases" in which the defendant can demonstrate that the

5    government's conduct "violates fundamental fairness" and is "so grossly shocking and so

6    outrageous as to violate the universal sense of justice."  *United States v. Stinson,* 647 F.3d 1196,

7    1209 (9th Cir. 2011).  This is an "extremely high standard."  *United States v. Black,* 733 F.3d

8    294, 302, (citing *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993)).  There are

9    only two federal appellate court decisions which have reversed convictions for outrageous

10   government conduct.  *Black,* 733 F.3d at 302 (citing *United States v. Twigg*, 588 F.2d 373 (3rd

11   Cir. 1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971)).

12        Because there is no bright line rule establishing when law enforcement's conduct goes

13   from acceptable to outrageous, each case must be resolved on its own facts, considering the

14   totality of the circumstances.  *Id.* at 302, 304.  The Ninth Circuit's decisions prior to *Black*

15   provided some guidance about when law enforcement conduct crosses the line between

16   acceptable and outrageous.  In *United States v. Williams,* 547 F.3d 1187, 1199 (9th Cir. 2008),

17   the Ninth Circuit held that it was outrageous for government agents to engineer and direct a

18   criminal enterprise from start to finish (internal quotations omitted).  It is outrageous government

19   conduct to use "excessive physical or mental coercion" to convince an individual to commit a

20   crime.  *United States v. McClelland,* 72 F.3d 717, 721 (9th Cir. 1995).  It is outrageous for the

21   government to generate new crimes "merely for the sake of pressing criminal charges."  *United*

22   *States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987).  It is not outrageous for law enforcement to

23   infiltrate a criminal organization, approach people who are already involved in or contemplating

24   a criminal act, or to provide necessary items to a conspiracy.  *United States v. So,* 755 F.2d 1350,

25   1353 (9th Cir. 1985).  It is also not outrageous for the government to "use artifice and stratagem

26   to ferret out criminal activity."  *United States v. Bogart,* 729 F.2d 1428, 1438.

27        Both sides rely heavily on the Ninth Circuit's 2013 decision in *Black* to support their

28   arguments.  There, the Ninth Circuit found that the reverse sting challenged on appeal fell

- 16 -

"within the bounds of law enforcement tactics that have been held reasonable." 733 F.3d at 302. A "reverse sting" is a term applied when the government initiates the criminal conduct, setting up a fictitious crime, and arresting criminals as they begin to carry out what they believe is a real crime. *Id.* at 298 & n.1.

Although the court upheld the conviction in *Black*, it was troubled by two aspects of the fictional sting operation and how it came about in the first place. First, the Court of Appeals was concerned that the defendants were convicted of conspiracy to possess cocaine with intent to distribute and use of firearms in furtherance of a drug trafficking crime which resulted from an operation created and staged by ATF. *Id.* at 302-303. An ATF undercover officer used a CI and invented the entire scenario, the need for weapons and a "crew," and determined the amount of cocaine involved. The court found that the facts of the case suggested that the defendants were responding to the government's script, and that their only overt actions involved showing up at meetings, arriving at a parking lot with four hidden, loaded weapons, and driving to the storage warehouse where they were arrested. The defendants' actions corroborated that they intended to carry out these robberies, but also that they were responding to the scheme created by the government.

The *Black* court's second concern with the reverse sting operation was how the government recruited the defendants. ATF did not infiltrate a suspected crew of home invasion robbers or seduce persons known to have actually engaged in these types of crimes. Rather, the evidentiary hearing established that ATF used the CI to find individuals willing to commit a home invasion. The CI testified he carried out his mission by going to bars in "bad" areas where persons engaged in criminal activity were likely to gather. On one visit to a bar, the CI approached a man to see if he would be interested in doing a home invasion robbery. The man said that he was not interested, but somebody he knew would be. The man introduced the CI to one of the defendants. The CI told the defendant that he had a friend with information about a house, possibly with some drugs in it, and asked whether the defendant would be interested in putting a crew together to rob the house. The defendant agreed, and the CI set up a meeting with the undercover ATF agent.

1    In a subsequent meeting with the defendant, CI and undercover agent, the undercover

2    agent gave a cover story that he was a cocaine courier who transported drugs for a group of

3    Mexican dealers and wasn't happy with the pay he was receiving.  The undercover agent stated

4    he wanted to rob the Mexican drug dealers, described the modus operandi, told the defendant

5    that at the beginning or end of each month he would receive a call informing him the drugs were

6    ready for transportation at a particular house, and that he would only have fifteen minutes to pick

7    up the drugs, or the dealers would move to a new location.  The undercover agent stated he

8    would enter the house, see two individuals, at least one of two would be armed, and that one of

9    the individuals would go to a back room to obtain six or seven kilograms of cocaine, give the

10   drugs to the undercover, and tell him where to take the drugs.  The undercover agent told the

11   defendant that each time he did this, he could see anywhere from twenty-two to thirty-nine

12   kilograms of cocaine in the living room and did not know what might be in the back room which

13   contained more cocaine.

14   The undercover emphasized that he wanted to make sure that people the defendants

15   involved in the proposed robbery had "the balls to go do it because this ain't no easy lick."  At an

16   evidentiary hearing, the undercover officer testified he chose details that demonstrated a

17   particularly high potential for danger and violence to ensure that only individuals who "are truly

18   involved in this type of crime" would agree to it, and those who are not would back out.  The

19   defendant told the undercover he had "goons" willing to commit robbery and murder and asked

20   the undercover on numerous occasions how many "goons we're gonna need."  Each time, the

21   undercover stated he did not know and the defendant should decide.

22   The defendant bragged about the criminal history and acumen of his "goons" to commit

23   crimes of this nature and subsequently introduced his co-defendants to the CI and undercover

24   agent in a meeting ten days later.  The undercover agent repeated his cover story about being a

25   disgruntled drug courier and his plans to rob a fictitious stash house.  Defendant Black proposed

26   several scenarios about how to rob the stash house, mentioned the possibility of taking an

27   occupant to the back room as a hostage, and told the undercover that he "got this shit down to a

28   science, man."

The initial target told the undercover that he and Black needed guns for the robbery, but they did not have any.  The undercover officer stated he did not either, and that if he had, he would do the robbery himself.  Black eventually said that getting guns would be no problem.  The undercover officer questioned Black and the individual who recruited him about their intention to do the robbery without other crew members, telling them that the men in the stash house were not going to just give the drugs to them.  Black and the individual who recruited him insisted that having a small crew would be better for taking a stash house by surprise, but eventually said they would probably bring in one or more crew members.  At the subsequent meeting, additional crew members were introduced to the undercover.

The additional crew members came to the third meeting with the undercover agent.  The undercover repeated his cover story and asked one of the new defendant crew members how he wanted to do the robbery, and the defendant responded, "You tell me, dude.  I mean, this is your gig.  I mean, I don't know about this shit."

At a meeting set with the undercover agent for the following day, the group did not show up at the time scheduled.  The undercover officer testified he felt he was being surveilled.  Twenty-five minutes after the scheduled meeting, the defendants pulled up in two vehicles with another individual who was introduced as a driver.  The undercover told the crew he had rented a warehouse unit nearby where they should deliver his portion of the cocaine from the stash house and asked them to follow him there.  When the group arrived at the warehouse, they were arrested.  A search of the vehicles uncovered four loaded weapons in a hidden compartment.

The individual who initially introduced the defendants to the undercover agent cooperated with the government and testified against his co-defendants at trial.  The defendants were convicted and appealed, arguing the government's conduct in the case was so outrageous that it violated the due process clause of the Fifth Amendment.  Although the Ninth Circuit was troubled by aspects of the government's investigation and tactics, it ultimately upheld the convictions, holding that the government's reverse sting operation did not amount to outrageous government conduct.

/ / /

In upholding the convictions, the Ninth Circuit applied the following factors its prior cases had found relevant to determine whether the government conduct was outrageous: (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and the necessity for the actions taken in light of the nature of the criminal enterprise at issue. *See Black,* 733 F.3d at 303.   However, the Ninth Circuit stated that these factors were not a "formulistic checklist," but a means to focus the court's "analysis of the totality of the circumstances." *Id*. at 304.

The Ninth Circuit reviews a district court's decision to grant or deny a motion to dismiss an indictment for outrageous government conduct de novo.  *Black,* 733 F.3d at 301.   In conducting its review, the Ninth Circuit views the evidence in the light most favorable to the government and accepts the district court's factual findings unless they are clearly erroneous.  *Id.*

Applying these factors to Williams' Motion to Dismiss, the court finds that under the totality of the circumstances, the government's conduct is not so outrageous that due process principles require dismissal of the Indictment.  For the reasons discussed below, the court finds that this is not such an extreme case requiring dismissal.  The government did not engage in conduct which violated fundamental fairness or that was so shocking and outrageous as to violate the universal sense of justice.

### 1.      Individualized Suspicion & Known Criminal Characteristics.

It is undisputed that the initial investigation that led to this undercover reverse sting operation stems from an investigation of White for selling firearms, including stolen firearms, to an ATF CI, and on the last two occasions, to the CI and TFO Larios.  White has not moved to dismiss the Indictment for outrageous government conduct.   There is no question that the government had individualized suspicion about White's criminal activities and was aware of White's criminal record before the reverse sting was initiated.

/ / /

The government alleges, and Williams does not dispute, that on January 6, 2014, the CI told ATF agents that the CI spoke to White on January 2, 2014, and White told the CI he and a second individual (with multiple felony convictions for robbery, second degree murder, and trafficking a controlled substance) had participated in an armed home invasion of a local methamphetamine dealer.  During the January 2, 2014, meeting with the CI, White stated that the victim of the home invasion robbery revealed where his proceeds were hidden after the perpetrators threatened to shoot his dog.  At the January 2, 2014, meeting, the CI stated that White had a large amount of money that White said was his share of the home invasion robbery of the methamphetamine dealer.  White also stated that the second individual at the meeting participated in the home invasion and claimed he had "youngsters" he called "rah rahs" available to handle any "business" the CI might have.

The CI reported this January 2, 2014, contact with White and the unidentified individual to his ATF handler on January 6, 2014.  On January 10, 2014, the CI and Larios conducted a controlled buy of stolen firearms from White.  After the transaction was completed, ATF agents learned that a stolen handgun White sold belonged to a victim of a 2008 homicide in Phoenix, Arizona.  At a subsequent meeting on January 28, 2014, the CI and Larios made another controlled purchase of a handgun and a 12 gauge shotgun from White.  The transcript of the recorded meeting confirms that Larios told White he had some "heavy lifting" for White.  White responded he was in the "construction business."  Larios stated he needed the "NFL" not "junior varsity" players, and White responded "my dudes are Hall of Fame."  This was the meeting that resulted in the ATF's initiation of the reverse sting operation for which Williams and his co-Defendants were indicted in this case.

By this time, White had sold a number of firearms, including stolen firearms, to the CI.  White also sold handguns to the CI and Larios at the January 10 and 28, 2014, meetings.  After the January 10th meeting, ATF investigation revealed that one of the firearms White sold had belonged to a victim of a 2008 homicide in Phoenix, Arizona.  This information came on the heels of the CI reporting to ATF that White and another unidentified individual claimed to have

/ / /

1    participated in a home invasion robbery of a stash house, provided details about the robbery, and

2    White had flashed a wad of cash he said was his share of the robbery's proceeds.

3         It is undisputed that the government did not have individualized suspicion or know of the

4    criminal history of Knapp or Williams until White brought them to the February 25, 2014,

5    meeting with the CI and Larios.  However, it was White, not ATF or its CI, who recruited Knapp

6    and Williams.  At the time White recruited his co-Defendants, White had committed a number of

7    crimes, ATF had ample individualized suspicion that White was willing to commit home

8    invasion robberies of a stash house, and was aware of White's criminal history.

9         The government does not need individualized suspicion of a defendant's wrongdoing

10   before conducting an undercover investigation, but it is "an important consideration." *Black*. 733

11   F.3d at 304 (citing *United States v. Luttrell*, 923 F.2d 764 (9th Cir. 1991) (en banc)).  This factor

12   is closely related to whether a defendant had a criminal background or propensity the

13   government knew about when it initiated its sting operation.  *Id.*  Here, the government concedes

14   that it had no knowledge of Williams' criminal history until after White brought him to the

15   February 25, 2014, meeting.  ATF was aware that White had committed multiple felonies in

16   selling firearms and stolen firearms, was a convicted felon, had reported that he had recently

17   conducted a stash house home invasion robbery, and had a crew willing to participate in home

18   invasion robberies.  The court finds that although the ATF lacked individualized suspicion of

19   Knapp or Williams, their appearance and statements at the February 25, 2014, meeting created

20   individualized suspicion.

21        Additionally, in *Black*, the Ninth Circuit found that although the government's lack of

22   individualized suspicion or knowledge of defendants' criminal characteristics weighed in favor

23   of the defendants, their repeated representations that they had engaged in related criminal activity

24   in the past "quickly supplied reasons to suspect they were likely to get involved in stash house

25   robberies."  *Id.* at 307.  Here, although the government had no information about Knapp or

26   Williams until the February 25, 2014, meeting, both stated in recorded conversations that they

27   had done home invasion robberies in the past, and that Knapp, Williams, and White had already

28   / / /

begun planning how to do the stash house robbery Larios proposed before they met with Larios that day.

The Ninth Circuit found that as long as the investigation was "initiated and performed tolerably as a whole, it would undermine law enforcement's ability to investigate and apprehend criminals if its otherwise acceptable conduct became outrageous merely because an individual with no known criminal history . . . joined the criminal enterprise at the behest of codefendants." *Id.* at 308 n.11.  The government has now produced the transcripts of the recorded undercover meetings, and Williams does not dispute their authenticity, genuineness, or accuracy.  The transcripts show that Williams was an eager participant in planning the fictional stash house robbery, and once the government set the bait, he expressed a willingness to participate and discussed his experience in this type of crime.

After Knapp and Williams were identified at the February 25, 2014, meeting, ATF conducted criminal records checks.  The criminal records checks reflected that both Defendants had convictions for violent felonies.  ATF had also obtained a police report for the June 2013 incident confirming White had been shot multiple times by men who thought White was planning to rob them.  The report reflects that White stated that either Deondre Williams or "Jay Dubb" was with him at the time he was shot.

## 2.    ATF's Role in Creating the Crime.

In evaluating whether the government engaged in outrageous conduct under the due process clause of the Fifth Amendment, the court should also consider whether the government initially approached the defendant, or whether the defendant approached the government agent. *Id.*  Additionally, whether the government proposed a criminal enterprise or merely attached itself to one that was already established and ongoing is a relevant factor.  *Id.*  Like the stash house robbery scheme in *Black*, the stash house robbery scheme in this case was entirely the government's creation.  In this case, it is undisputed that the ATF did not initiate its reverse sting investigation until after White told the CI that he and another individual had recently committed a home invasion robbery and that White was interested in putting together a crew to do future

/ / /

1   home invasion robberies.  Williams does not dispute that the CI told ATF that White claimed he

2   had individuals willing to commit home invasion robberies and murder if necessary.

3          This is not a case of the government's CI trawling bars in impoverished minority

4   neighborhoods to see if he could get individuals interested in doing home invasion robberies for

5   untold riches to take the bait.  The undercover sting operation was only initiated after White told

6   the CI who told his ATF handlers that White had recently claimed to have committed home

7   invasion robberies and was interested in putting a crew together to do future home invasion

8   robberies.  Before the ATF initiated its reverse sting operation, White made a number of

9   controlled buys of firearms and stolen firearms to the CI and two controlled buys to the CI with

10  the ATF undercover officer present.  It was only after White had engaged in multiple felony

11  transactions, including selling a stolen firearm belonging to a victim of a 2008 Arizona homicide,

12  that a meeting was arranged with White, the CI, and Larios.  It was during this meeting that the

13  undercover asked if White was interested in a "heavy lifting" home invasion-type robbery of a

14  stash house.  The transcript of the recorded meeting reflects that White enthusiastically embraced

15  the proposal and boasted that he had a trusted experienced crew also willing to participate.

16         The recorded conversations indicate that all three Defendants were enthusiastic, willing

17  participants who boasted about their prior escapades, including their acumen and prior

18  experience in home invasion-type robberies and were willing to plan and participate in the

19  crimes for which they were eventually indicted.

20                          **3.      ATF's Encouragement of Defendants.**

21         The extent to which the government encouraged a defendant to participate in the charged

22  conduct is important, and "mere encouragement" is less likely to qualify as "outrageous conduct"

23  than pressure or coercion.  *See Black,* 733 F.3d at 308.  Williams contends the government did

24  more than merely encourage him to commit the crime when the undercover agents asked

25  Williams whether he was "down for it," inquiring whether Williams had "tools" for the job,

26  stating they needed to find the "right guys" to do the job, agreeing to split the proceeds down the

27  middle, telling Williams the home invasion was a "try out," and if all went well, Williams would

28  be kept on "retainer."

However, the court's review of the transcripts does establish that the ATF engaged in outrageous government conduct which threatened or coerced Williams to engage in a fictional stash house home invasion robbery.  The government certainly set the bait by proposing the stash house robbery and made it enticing with the quantity of drugs it claimed was there and the lax security of the two Mexican dudes, one of whom was armed and would admit a trusted courier.  However, Larios also told the Defendants he had never seen any cash in the drug house.  The transcripts show that the Defendants were not cajoled, pressured, harassed, or coerced into going along.  In fact, they were told more than once that they could back out if they wanted. They all accepted the plan when it was proposed, professed a willingness to do whatever was necessary, said they had the tools, would use zip ties to take the occupants hostage, and would give Larios a body or stomach shot to make sure that he was not suspected of participation in the robbery.  The transcripts reflect that the Defendants were eager and willing participants who eagerly jumped at the opportunity.

### 4.       ATF's Participation in the Crime.

In considering the government's participation in offense conduct, the Ninth Circuit has instructed that the court should look at the duration, nature, and necessity of the government's participation.  *Id.*  Participation for a longer time is of greater concern than intermittent or short-term involvement.  *Id.* (citing *Greene,* 454 F.2d at 786) (finding outrageous government conduct where government's participation was of "extremely long duration," lasting about three years).  In examining the nature of the government's participation, the court looks at whether the government acted as a partner in the criminal activity or an observer of a defendant's criminal conduct, and the court also considers any "particularly offensive conduct" by the government during the course of the sting.  *Id.*  Lastly, in determining the necessity of the government's participation in the criminal enterprise, the court looks at whether a defendant would have had the technical expertise or resources necessary to commit the crime without the government's participation.  *Id.* at 309.

Here, the reverse sting operation was not initiated until after White told the CI that he had recently conducted a home invasion robbery, displayed cash he reported came from the robbery,

and stated he wanted to put together a crew to perform future home invasion robberies.  The entire reverse sting consisted of four meetings between February 12, 2014, and March 5, 2014, when all of the Defendants were arrested.  Only White, the CI, and Larios were present at the February 12, 2014, meeting to discuss the "heavy lifting" home invasion robbery of a stash house.  There were only two subsequent meetings on February 25, 2014, and March 2, 2014, before the final meeting, which resulted in the Defendants' arrest on March 5, 2014.  It is undisputed that the entire proposed home invasion robbery of a stash house occurred over a three-week period.  The ATF investigation of Williams lasted a mere eight days between February 25, 2014, and March 5, 2014.

The ATF participated in the offense conduct by providing the basic scenario for the stash house robbery, but left it to the Defendants to decide how to execute it.  The transcripts of the recorded meetings contain repeated statements by Carr that he did not want to tell them how to do their business, although Carr asked about their plan, whether they were prepared, and had the "tools" for the job.  The transcripts do not support Williams claim that either ATF agent offered to supply weapns.  To the contrary, all three Defendants professed to have the "tools" they needed. Carr and Larios also asked the Defendants how they planned on getting rid of the drugs indicating they had people if the Defendants did not.  However, the Defendants said they had a way to get rid of the drugs and explained their plans to sell the drugs in Texas to avoid word getting out on the street about the stash house robbery.  Carr did offer to get the Defendants a rental car they could use as a getaway vehicle so they would not have to drive one of their own vehicles.  However, the rental car was not going to be provided until the day of the robbery.  ATF also provided the warehouse serving as the staging area for the final meeting preceding the fictitious stash house robbery.  Nothing in the record indicates whether the rental car was actually brought to the warehouse facility.  The transcript of the March 5, 2014, final meeting and arrest does not indicate the car was discussed.

All three Defendants discussed their plan to gain entry to the stash house.  Their initial plan was to have Larios leave the door unlocked after he was admitted, and the Defendants would rush in as Larios was leaving.  However, after discussing it among themselves before the

next meeting with the CI and Larios, the Defendants decided it would be better to immediately

"get the drop on" the men answering the door to "get up close and personal" and take immediate

control of the situation as Larios entered the stash house.  Williams said he thought that rushing

the door as Larios was leaving would be less likely to implicate Larios than their initial plan to

rush in as Larios entered.  Williams made several comments about the point of entry, wanting

everything to "go right' and the need to act and play a role.  Williams provided the cell phone

number at which Larios could contact them the day of the robbery and suggested that Larios

write it down on paper rather than put it in his phone in case somebody took his phone and

looked through it.  White, Knapp, and Williams were intimately involved in planning the stash

house robbery, and neither Larios or Carr offered direction about how to do the robbery or

provided weapons to commit the offense.   These facts weigh against finding outrageous

government conduct.

### 5.  Nature of the Crime Being Investigated.

Finally, the Ninth Circuit instructs lower courts to consider the need for the investigative

technique used in light of the challenges of investigating and prosecuting the type of crime

charged.  *Id.* at 309.   The *Black* court recognized that "stash house robberies are largely

unreported crimes that pose a great risk of violence in residential communities."  *Id.*  In addition,

reverse sting operations were designed to avoid risks inherent to a real stash house robbery

because the situation is controlled and unfolds just enough to capture people willing to commit

such a crime without taking the final step of an actual home invasion.  *Id.*  These risks, however,

do not give the government license to forego other techniques to identify and target suspects.  *Id.*

at 309-310.  Additionally, courts must be "vigilant" that the government only "sets the bait" and

does not "create criminal convictions by outrageous means."  *Id.* at 310.

Law enforcement conduct becomes unconstitutional when the government directs the

criminal enterprise from "*start to finish*."  *Id.* (emphasis in original).  Generating new crimes

simply for the sake of pressing criminal charges is outrageous government conduct, "at least

where the government essentially manufactured the crime."  *Id.* (citing *Emmert*, 892 F.2d at 812-

13).  The Ninth Circuit has observed that "it is difficult to discern the point of division at the

1    margins between police conduct that is just acceptable and that which goes a fraction too far."

2    *Id.* (citing *Bogart*, 783 F.2d at 1438).

3           The facts in this case are far less egregious than the facts the Ninth Circuit questioned,

4    but nevertheless upheld, in *Black*, which involved a very similar ATF-initiated fictitious stash

5    house robbery.  This case does not involve a random, dragnet of poor neighborhoods looking for

6    otherwise law-abiding young men living in poverty given an opportunity to commit a robbery

7    with untold riches that would lift them out of their impoverished state.  This reverse sting was

8    only initiated after White bragged that he had recently committed a home invasion robbery of a

9    methamphetamine dealer, discussed the details, flashed a wad of cash he said was his share of

10   the proceeds, and stated he wanted to put together a crew to do future stash house robberies.

11   When Knapp and Williams were introduced at the February 25, 2014, meeting, they both

12   claimed that they had experience committing home invasion-type robberies and were eager to

13   participate in the fictional crime that was described.

14          *Black* was a two-to-one decision.  Judge Noonan authored a strong dissent critical of the

15   reverse sting operation of an imaginary stash house that takes no real drugs off the streets.  He

16   found the fictional crime orchestrated by the ATF designed to tempt and trap criminals "conduct

17   disgraceful to the federal government."  *Black*, 733 F.3d at 318.  Judge Reinhardt authored a

18   similarly strong dissent denying Black's petition for rehearing en banc.  *United States v. Black,*

19   *750* F.3d 1053 (9th Cir. 2014) (Reinhardt, J., dissenting).  Even more recently, Judge Wright

20   recently dismissed an indictment arising out of an ATF reverse sting operation remarkably close

21   to the factual pattern in this case.  *Hudson*, 3 F. Supp. 3d 772 (C.D. Cal. 2014).  However, the

22   majority opinion in *Black* is controlling and requires an analysis of the totality of the

23   circumstances on a case-by-case basis.  For the reasons stated, the court concludes that the

24   totality of the circumstances presented here do not meet the extremely high standard set by the

25   Ninth Circuit for dismissal of an indictment for outrageous government conduct.

26          **C.     Dismissal Pursuant to the Court's Supervisory Powers.**

27          The court may exercise its supervisory powers to dismiss an indictment where: (1) the

28   government violated a defendant's recognized right; (2) engaged in illegal conduct that must be

1    deterred; or (3) where there is evidence that a jury's verdict rested upon inappropriate

2    considerations.  *Id*. at 310 n.12 (citing *United States v. Ramirez*, 710 F.2d 535, 541 (9th Cir.

3    1983)).  The supervisory power provides authority for the courts to supervise their own affairs,

4    not the affairs of the other branches of government.  *See United States v. Sampson*, 927 F.2d

5    1088, 1091 (9th Cir.1991).  "Judicial integrity is rarely threatened significantly when executive

6    action does not violate the Constitution, a federal statute, or a procedural rule."  *United States v.*

7    *Gatto*, 763 F.2d 1040, 1046 (9th Cir. 1985).  Williams has not established that the government

8    violated a recognized constitutional or statutory right, engaged in any illegal conduct that must

9    be deterred, and as this case is in the pretrial stages, the third factor does not apply.

10   **III.   Conclusion**.

11        The facts of this case are far less egregious than the law enforcement conduct the Ninth

12   Circuit found troubling, but still upheld in *Black*.  ATF did not use a CI to trawl bars in bad areas

13   of town looking for impoverished individuals to tempt them to commit a crime that would net

14   unimaginable immediate wealth.  White was already under ATF's radar as a convicted felon who

15   was selling multiple firearms, some of them stolen, to an ATF CI in controlled buy situations that

16   were surveilled, monitored, and recorded.  It was only after White claimed to have committed a

17   recent armed home invasion of a local methamphetamine dealer and was looking to put a crew

18   together to do more home invasion robberies that ATF lodged its reverse sting operation which

19   netted White and his co-Defendants.

20        For the reasons stated,

21        **IT IS RECOMMENDED** that Williams' Motion to Dismiss (Dkt. #36) be **DENIED**.

22        Dated this 10th day of November, 2014.

23

24        Peggy A. Leen
          United States Magistrate Judge
25

26

27

28